RENDERED: AUGUST 20, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-000454-DG

DENNIS THOMAS, AS ADMINISTRATOR OF        APPELLANT
THE ESTATE OF GLENDA THOMAS,
DECEASED, AND DENNIS THOMAS,
INDIVIDUALLY


                 ON REVIEW FROM COURT OF APPEALS
V.                CASE NO. 2016-CA-001557-MR
            JEFFERSON CIRCUIT COURT NO. 09-CI-07333


UNIVERSITY MEDICAL CENTER, INC.        APPELLEES
D/B/A UNIVERSITY OF LOUISVILLE
HOSPITAL; NEUROSURGICAL INSTITUTE
OF KENTUCKY, P.S.C.; TODD W. VITAZ,
M.D., SARAH C. JERNIGAN, M.D., AND
AASIM KAZMI, M.D.


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Dennis Thomas, in his capacity as Administrator of the estate of his deceased wife, Glenda Thomas, and in his individual capacity, appeals the decision of the Jefferson Circuit Court to exclude from evidence a Root Cause Analysis ("RCA") and to grant a directed verdict in favor of Neurosurgical Institute of Kentucky, P.S.C. ("NIK"). The Court of Appeals affirmed the decision of the Jefferson Circuit Court. Having reviewed the record and considered the arguments of the parties, we hereby affirm the decision of the Court of Appeals, though for different reasons.

# I. BACKGROUND

On August 15, 2008, fifty-year-old Glenda Lee Thomas underwent an anterior cervical discectomy and fusion procedure, which required a surgical incision on her neck. The surgery was performed at University Medical Center, Inc. ("UMC") by Dr. Aasim Kazmi, a sixth-year neurosurgical resident, under the supervision of Dr. Todd Vitaz, the attending surgeon.

After the operation, Mrs. Thomas was transported to the post-anesthesia care unit ("PACU"). She arrived at approximately 2:30 PM. The PACU record indicates that her breathing was unlabored and regular. At around 5:00 PM that day, Mrs. Thomas was discharged from the PACU and transferred to the medical floor. The PACU records indicate that, at the time of discharge, she was in good condition and oriented, with clear speech and controlled pain.

At approximately 8:00 PM, a nurse noted in Mrs. Thomas's chart that she suffered from dyspnea (shortness of breath), labored breathing, and pursed lips. Soon after, Dr. Sarah Jernigan, a fifth-year neurosurgical resident, examined Mrs. Thomas. Dr. Jernigan noted swelling in Mrs. Thomas's neck and complaints of worsening shortness of breath. However, Dr. Jernigan also noted that Mrs. Thomas's speech was fluent, she did not require increased oxygen, and she was not short of breath during conversation. Dr. Jernigan further noted that a firm hematoma, three to four centimeters at its largest diameter, was centered on the neck incision. Dr. Jernigan ordered a steroidal drug and an x-ray.

2

At approximately 9:00 PM, after the x-rays were completed, Dr. Jernigan returned to Mrs. Thomas's bedside. Jernigan noted that Mrs. Thomas was now wheezing, "having more difficulty breathing," and could no longer carry on a conversation. Dr. Jernigan ordered Mrs. Thomas back to the operating room for wound exploration.

The anesthesiology resident then made his way to Mrs. Thomas's room to perform a pre-operative assessment of Mrs. Thomas. As he arrived on her floor, Dennis Thomas, Mrs. Thomas's husband, ran out of her room, stating that "she can't breathe." The anesthesiologist and Dr. Jernigan went immediately to Mrs. Thomas's bedside and began using an AMBU bag, a manual resuscitator. The doctors also called a Code 900 and opened the neck incision to evacuate the hematoma. The Code team arrived but struggled to intubate Mrs. Thomas. She was taken to the operating room for a tracheostomy and exploration of the neck wound.

Unfortunately, Mrs. Thomas suffered from anoxic encephalopathy, or brain injury from lack of blood flow. She passed away a few days later, after supportive care was withdrawn.

Dennis Thomas, in his capacity as administrator of his wife's estate and in his individual capacity, filed a medical negligence suit against UMC, Drs. Vitaz, Jernigan, and Kazmi, and NIK, a private neurosurgery practice of which

Dr. Vitaz was a member.[1] He later added claims of negligent training and supervision.

During discovery, UMC revealed the existence of a "Root Cause Analysis and Action Plan."[2] This RCA report consists of a chart, in which a series of questions are asked and answered. For example, beside a box listed "Equipment factors" is a question: "How did the equipment performance affect the outcome?" The response listed on the RCA chart is "None." When asked if equipment performance was a "Root Cause," the response is "N" or no. The RCA asks a series of similar questions, such as "What factors directly contributed to the outcome?" and "To what degree was the physical environment appropriate for the processes being carried out?"

At issue in this case is the response to the question "What human factors were relevant to the outcome?" The reply to this question states, "Medical management of airway in postoperative patient." When asked if this was a root cause, the response is "N" or no. However, in response to the question "Take action?" the report references "1," or Action Plan Item No. 1. The Action Plan is attached to the RCA. Action Plan Item No. 1 states, under the "Risk Reduction

---

[1] By amended complaint, Thomas added as defendants Drs. Mark Glasgow (the attending anesthesiologist who responded to the Code 900) and Maya Leggett (an attending physician who responded to the Code 900). However, by order entered April 3, 2012, the trial court granted motions for summary judgment filed by both doctors, thereby dismissing them from this case. In August 2012, Thomas filed a second amended complaint, which did not include Drs. Glasgow or Leggett.

[2] Throughout the record, the RCA report is sometimes referred to as an "RCA/sentinel event report." The document itself is titled "Root Cause Analysis and Action Plan," but for ease of reference, we refer to the entire document as the RCA.

4

Strategies" category, "Respiratory/Airway/Assessment Skills: Inservice education for nursing staff and surgical resident staff to recognize signs and symptoms of mechanical airway obstruction." Under the "Responsible Person(s)" heading, the response is "Nursing Education Residency Coordinator; Department of Neurosurgery and Department of Anesthesia." Under the "Measures of Effectiveness" heading, the response is "Measure: Inservice education will be provided in November 2008." Finally, under the "Evaluation Schedule" heading, it is noted that "100% of individuals involved in incident will have inservice education by Nursing Education or Attending-level for Department of Neurosurgery residents and Anesthesia residents." Later, depositions of the individuals involved in Mrs. Thomas's care revealed that those individuals did not receive the recommended inservice training.

UMC ultimately filed a motion in limine to exclude the RCA report as a subsequent remedial measure under Kentucky Rule of Evidence ("KRE") 407. By order dated January 19, 2016, the trial court granted that portion of UMC's motion relating to the RCA report. The court explained, however, that "in keeping with KRE 407, the Court recognizes that there may be circumstances under which information contained in the Root Cause Analysis and Action Plan may be, or become, admissible." The trial court directed Thomas's counsel to first approach the bench "to discuss the application of KRE 407 outside the presence of the jury," should such a situation arise.

Thomas later sought clarification of the trial court's ruling, requesting that the RCA be admissible under KRS 411.186(2)(e)[3] as post-incident conduct in support of his claim for punitive damages. By order dated June 16, 2016, the trial court explained,

> Insofar as this proposed use [under KRS 411.186(2)(e)] seems to be incongruous with the public policy underlying the subsequent remedial measures rule codified under KRE 407, this was not the particular circumstance the Court had in mind when issuing the previous ruling. Be that as it may, [the] Court nevertheless continues to appreciate that the information developed/revealed in the course of the RCA may be relevant, probative and admissible. However, as is the case in every case, the Court is obliged to weigh the probative value of any such information against any attendant prejudicial impact.
>
> In the instant case, the fact that an RCA was conducted is of no evidentiary value. The information developed/revealed in the course of the RCA is of minimal probative value in terms of the allegation that Mrs. Thomas' [sic] death was the result of negligent conduct by the Defendants. Rather, and somewhat morbidly, the probative value of same lies in a case where someone dies under similar circumstances *after* the Defendants' RCA in Mrs. Thomas' [sic] case. Were this *that* case, the Court would be obliged to permit the Plaintiff to introduce evidence from the RCA. Because it is *not*, and in light of the prejudicial impact associated with the information, the Court is not inclined to revisit its previous ruling excluding same from the Plaintiff's case-in-chief.

The trial court noted, however, that "the information may be used to impeach or rebut testimony offered or elicited by the Defendants."

The matter proceeded to an eight-day jury trial in June 2016. At the close of evidence, the court granted a directed verdict in favor of NIK. NIK, a

---

[3] Under this statute, in cases in which the trier of fact concludes that punitive damages should be awarded, the trier of fact must assess those damages by considering a variety of factors, including "[a]ny actions by the defendant to remedy the misconduct once it became known to the defendant." KRS 411.186(2)(e).

private neurosurgery practice, had been sued for the negligence of its agents, as well as its own negligent training and supervision of neurosurgical residents Drs. Kazmi and Jernigan. The trial court found that insufficient evidence had been presented to support these claims.

The jury returned verdicts in favor of the remaining defendants. Thomas moved for a new trial, arguing that the RCA was improperly excluded from trial. The trial court denied the motion.

Thomas then appealed to the Court of Appeals. He argued that the trial court improperly precluded use of the RCA as substantive evidence of negligence and as impeachment evidence. The court affirmed the circuit court's judgment. In doing so, it held, "As a general matter, 'formulating a plan to require additional training' qualifies as a 'subsequent measure' within the plain meaning of [KRE 407]." The Court of Appeals cited no authority to support this statement, and it is unclear from what source the quoted portions originate.

The Court of Appeals then explained that UMC's "lack of follow through on mandating additional training undermines [Thomas's] claim that the RCA and Action Plan were probative of [UMC's] fault." "If a defendant is deemed to speak through its actions and does *nothing*," the court explained, "it admits *nothing*." The Court of Appeals therefore concluded that "the trial court committed no abuse of discretion by excluding the RCA and Action Plan from evidence; these documents had little probative value and would have distracted the jury from the relevant issues presented."

7

Lastly, the Court of Appeals addressed Thomas's argument that the trial court erred in granting a directed verdict in NIK's favor. The Court of Appeals declined to fully analyze this issue, noting that any error was harmless, as the jury ruled in favor of the physician-defendants.

This Court granted discretionary review.

## II. ANALYSIS

Thomas now argues that (1) the trial court erred in excluding the RCA under KRE 407; (2) the Court of Appeals misconstrued the evidence in the record and improperly considered and applied KRE 403; (3) the trial court erred in excluding the RCA when offered for impeachment purposes; and (4) the trial court erred in directing a verdict in favor of NIK. We address each argument in turn.

### A. The trial court erred in excluding the Root Cause Analysis under KRE 407; however, that error was harmless.

KRE 407 states, in full,

> When, after an event, measures are taken which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

In other words, evidence of a subsequent remedial measure is not admissible to prove liability. Under the plain language of the rule, a subsequent remedial measure includes a "measure" taken after an event "which, if taken previously,

8

would have made an injury or harm allegedly caused by the event less likely to occur."

In this case, the trial court excluded the RCA under KRE 407. The Court of Appeals affirmed, holding that "formulating a plan to require additional training" qualified as a "subsequent measure" under the rule, though the court cited no authority for this statement. Thomas now argues that the Court of Appeals overlooked that portion of KRE 407 which requires that the "subsequent measure" actually be remedial, or in other words, the requirement that the subsequent measure "would have made an injury or harm allegedly caused by the event less likely to occur." Thomas argues that the mere contemplation of additional training does not make the harm "less likely to occur." Thus, Thomas argues, the trial court erred in excluding the RCA under KRE 407, and the Court of Appeals erred in affirming that decision.[4]

Typically, when reviewing a trial court's evidentiary rulings, our review is limited to a determination of whether the trial court abused its discretion. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000)

---

[4] In its brief to this Court, NIK argues for the first time that the RCA is inadmissible under the peer review privilege of KRS 311.377, and thus, that this issue is moot, as the RCA would not be admissible on remand. NIK points to the most recently amended version of this statute, which expressly applies the peer review privilege to medical malpractice actions. We will not consider NIK's argument, however, because the amendment that NIK relies on did not go into effect until July 14, 2018, well after the June 2016 trial in this case. At the time of the trial, the statute did not apply to medical malpractice actions like the current case. Because we are not remanding this case, we need not decide whether the RCA would now fall within the scope of KRS 311.377, and we decline to provide an advisory opinion on whether this statute would preclude admission of similar investigatory reports in future medical malpractice cases.

9

(citations omitted). However, in this case, we must first determine, as a matter of law, whether a post-incident investigatory report like the RCA falls within the scope of KRE 407. Accordingly, the immediate issue before us is a question of law, which we review de novo. *Saint Joseph Hosp. v. Frye*, 415 S.W.3d 631, 632 (Ky. 2013) (citation omitted).

This Court has not yet addressed the question of whether post-incident investigatory reports like the RCA in this case qualify as a subsequent remedial measure under this rule. However, KRE 407 largely mirrors Federal Rule of Evidence ("FRE") 407.[5] Accordingly, we consult federal case law interpreting FRE 407 when interpreting our own KRE 407.

For example, the Evidence Rules Review Commission's notes to KRE 407 cite to a Fourth Circuit case, in which that court stated, "The rationale behind Rule 407 is that people in general would be less likely to take subsequent remedial measures if these repairs or improvements would be used against them in a lawsuit arising out of a prior accident. By excluding this evidence defendants are encouraged to make such improvements." KRE 407, Editors' Notes (quoting *Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 857 (4th Cir. 1980)). Simply put, then, "[t]he rationale behind the rule is a public policy concern. Evidence of certain remedial efforts is not admissible so that parties will perform remediation without concern for any possible court action." *Tilford v.*

---

[5] Prior to 2011, KRE 407 was identical to FRE 407. In 2011, FRE 407 was amended, but the Advisory Committee notes state that this amendment was stylistic only. Accordingly, we continue to examine federal court decisions interpreting FRE 407 when interpreting KRE 407.

10

*Illinois Cent. R. Co.*, Nos. 2010-CA-000334-MR, 2010-CA-000380-MR, 2011 WL 2436742, *4 (Ky. App. June 17, 2011) (citing *Com., Cabinet for Health and Family Services v. Chauvin*, 316 S.W.3d 279, 303 (Ky. 2010) (Abramson, J., dissenting)). *See also Frye v. CSX Transp., Inc.*, 933 F.3d 591, 604 (6th Cir. 2019) ("[A] party should not be dissuaded from minimizing the risk of future harm for fear that such remedial measures will be used against the party to establish its liability for the originating accident.")

As to whether investigatory reports should be excluded under FRE 407, only a small number of jurisdictions have considered the issue. Of those federal courts that have addressed it, some have held that such reports do *not* qualify as a subsequent remedial measure under the rule. For example, in *Rocky Mountain Helicopters, Inc. v. Bell Helicopters*, 805 F.2d 907 (10th Cir. 1986), the trial court admitted a report that had been compiled after the helicopter accident giving rise to the suit. *Id.* at 918. The plaintiffs argued that the accident was caused by the fatigue failure of a certain helicopter part, and the report summarized a post-accident "stress study" about this particular part. *Id.* After the report, the helicopter part was redesigned, though references to that redesign were excluded from trial. *Id.*

The Tenth Circuit ultimately affirmed the trial court's decision to exclude evidence of the redesign but admit the report. It explained,

> It would strain the spirit of the remedial measure prohibition in [FRE] 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as "measures" which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is

11

usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. In this case, the remedial measure was not the [study] of the [helicopter part] but rather the subsequent redesign of the [part]. As noted above, references to redesign were excluded at trial.

*Id.* In support of this analysis, the Court also noted that "the policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned." *Id.* To the extent such concerns arise, "they are outweighed . . . by the danger of depriving 'injured claimants of one of the best and most accurate sources of evidence and information.'" *Id.* at 918–19 (quoting *Westmoreland v. CBS Inc.*, 601 F.Supp. 66, 68 (S.D.N.Y. 1984)).

Other federal and state courts have ruled similarly on the admission of a post-incident investigatory report.[6] Like the Tenth Circuit, these courts have

---

[6] *See, e.g.*, *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 431 (5th Cir. 2006) (declining to extend FRE 407 to investigations "which by themselves do not make the accident less likely to occur"); *Benitez-Allende v. Alcan Aluminio do Brasil, S.A.*, 857 F.2d 26, 33 (1st Cir. 1988) (holding that report at issue was "'internal investigatory report' of the sort not protected by Rule 407"); *J.M. v. City of Milwaukee*, 249 F.Supp.3d 920, 932 (E.D. Wisc. 2017) (holding that the investigation leading to the remedial act of employee discipline did not fall within scope of FRE 407); *Aranda v. City of McMinnville*, 942 F.Supp.2d 1096, 1103 (D. Or. 2013); ("By it [sic] terms, [FRE 407] is limited to measures that would have made the harm less likely to occur; it does not extend to post-incident investigations into what *did* occur."); *Westmoreland*, 601 F.Supp. at 67 ("The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting from an internal investigation of a mishap must also be excluded."); *Bergman v. Kemp*, 97 F.R.D. 413, 418 (W.D. Mich. 1983) (explaining that FRE 407 did not bar admission of investigatory report because report was "not a measure taken which is an indicia of a change that was made to make an event less likely to occur or to correct a previous condition," nor did it cause any change); *Bullock v. BNSF Ry. Co.*, 399 P.3d 148, 158 (Kan. 2017) ("[I]t is not unusual for some evidence to include information that is permissible, such as investigative conclusions, and information that is impermissible, such as [the recommended remedial measure of] employee discipline."); *City of Bethel v. Peters*, 97

concluded that investigatory reports alone do not qualify as subsequent remedial measures under FRE 407. Essentially, these courts reason that such investigations and reports, if performed prior to the accident, would not "have made an injury or harm allegedly caused by the event less likely to occur," as required by the rule. When the report references a remedial measure or recommends some remedial action, a few of these courts have chosen to redact the offending portion of the report, thereby allowing the remainder of the report into evidence.[7]

Conversely, other jurisdictions that have considered this issue have held that such investigatory reports qualify as subsequent remedial measures and must be excluded in full, regardless of whether the reports recommend remedial measures.[8] The Supreme Judicial Court of Massachusetts has

---

P.3d 822, 827 (Alaska 2004) (holding that post-incident report, with "corrective action" section redacted, was admissible); *Fox v. Kramer*, 994 P.2d 343, 352 (Cal. 2000) (noting that the majority of courts "distinguish between an investigation and actual steps taken to correct a problem; postevent investigations do not themselves constitute remedial measures, although they might provide the basis for such measures"); *J.B. Hunt Transp., Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 966 (Ind. Ct. App. 2016) ("The majority of jurisdictions agree that a post-incident investigation and report of the investigation do not constitute inadmissible subsequent remedial measures.").

[7] *See, e.g.*, *Prentiss & Carlisle Co., Inc. v. Koehring-Waterous Div. of Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir. 1992) ("The fact that the analysis may often result in remedial measures being taken (as occurred here) does not mean that evidence of the analysis may not be admitted."); *Bullock*, 399 P.3d at 158 ("[I]t is not unusual for some evidence to include information that is permissible, such as investigative conclusions, and information that is impermissible, such as [the recommended remedial measure of] employee discipline."); *Peters*, 97 P.3d at 827 (holding that post-incident report, with "corrective action" section redacted, was admissible).

[8] *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir. 1986) (holding that internal affairs investigation and measures taken as a result were remedial measures under FRE 407); *Alimenta (U.S.A.), Inc. v. Stauffer*, 598 F.Supp. 934, 940 (N.D. Ga. 1984) (holding post-incident report to be a "subsequent remedial

13

provided an explanation of the rationale behind this minority view. That court affirmed the exclusion of an investigation into the causes of an incident involving a public bus. *Martel*, 525 N.E.2d at 664. It acknowledged that, traditionally, a subsequent remedial measure is a repair, such as fixing a broken elevator or improving the design of a product. *Id.* However, the court explained, "we think that good public policy also requires the exclusion of the results of the defendant's investigation into the causes of an accident involving its bus. Although not itself a 'repair' of a dangerous condition, the investigation is the prerequisite to any remedial safety measure." *Id.* Thus, the court reasoned, "[t]he investigation is inextricably bound up with the subsequent remedial measures to which it may lead, and questions of admissibility of evidence as to each should be analyzed in conjunction and answered consistently." *Id.* The court felt that to rule otherwise "would discourage potential defendants from conducting such investigations, and so preclude safety improvements, and frustrate the salutary public policy underlying the rule." *Id.*

While we similarly seek to encourage the investigation of accidents and the improvement of dangerous conditions, we do not believe that the aforementioned policy purpose justifies a broad, blanket exclusion of post-incident investigatory reports under KRE 407. Nevertheless, like Massachusetts, we are concerned that the admission of an investigatory report

---

measure" because it was prepared for the purpose of improving company procedures); *Martel v. Mass. Bay Transp. Auth.*, 525 N.E.2d 662 (Mass. 1988).

14

might "discourage potential defendants from conducting such investigations, and so preclude safety improvements, and frustrate the salutary public policy underlying the rule." *Martel*, 525 N.E.2d at 664. Simply put, we do not want potential defendants to shy away from self-critical analyses and improvements for fear that the same can be used against them in a civil suit. Such self-critical analysis is a key step in improving safety conditions, procedures, and outcomes.

Against this concern, we balance the concerns expressed by the Tenth Circuit. Like that court, we acknowledge that, under some circumstances, the policy considerations of the rule may be outweighed by "the danger of depriving 'injured claimants of one of the best and most accurate sources of evidence and information.'" *Rocky Mountain Helicopters*, 805 F.2d at 918–19 (quoting *Westmoreland*, 601 F.Supp. at 68). However, we do not believe that such policy concerns will *always* be outweighed by this danger. Rather, we believe that an investigatory report may *sometimes* provide relevant and reliable evidence about the incident in question, but in other cases, the report may prove to be "very poor proof of negligence or defectiveness." *See In re Air Crash Disaster*, 86 F.3d 498, 529 (6th Cir. 1996) (explaining that, in addition to encouraging safety upgrades, another purpose of this exclusionary rule is to "bar[] a class of evidence that is very poor proof of negligence or defectiveness." (citing 2 Weinstein's Evidence § 407, 13–14)). For example, in some cases, an investigatory report may describe what happened, but provide very little insight into *why* it happened. That report may be of limited value; it does not

15

necessarily aid the plaintiff in demonstrating negligence or liability. In those cases, the policy considerations behind the rule may outweigh the desire to provide injured claimants with evidence.

Accordingly, in considering whether a post-incident investigatory report should be excluded under KRE 407, we are mindful of two competing interests: the desire to encourage potential defendants to investigate and improve their practices and safety conditions, and the interest in ensuring that tort victims may access and use relevant and reliable evidence. We do not believe, however, that we must forsake one set of concerns to achieve the other. Rather, we believe that the admission of a post-incident investigatory report should be considered on a case-by-case basis. More specifically, we believe that the analysis turns on whether the report recommends a remedial change and whether that change is implemented.

To demonstrate this point, we consider the possible scenarios in which this issue might arise. In some cases, like the one before us, a post-incident report recommends some remedial measure, and that measure is *not* taken— whether as a result of an intentional decision not to act or an unintentional failure to act. In that situation, the report itself is merely a "prerequisite to any remedial safety measure." *Martel*, 525 N.E.2d at 664. It is an analysis of what went wrong or what factors influenced the outcome and what can be improved. In most cases, this information alone would not have made the incident less likely to occur; the incident is only less likely to occur if some action had been taken in response to that information. In this scenario, the report generally will

16

not qualify as a subsequent remedial measure "which, if taken previously, would have made an injury or harm allegedly caused by the event less likely to occur." KRE 407. Thus, generally speaking, KRE 407 would not prevent the admission of the report when its suggested remedial measures are not taken.

We acknowledge, however, that "[i]t might be possible in rare situations to characterize such reports as 'measures' which, if conducted previously, would reduce the likelihood of the occurrence." *Rocky Mountain Helicopters*, 805 F.2d at 918. Accordingly, the question of whether an investigatory report in this scenario qualifies as such a measure must be left to the sound discretion of the trial court.

In other cases, however, an investigatory report includes a recommendation for some remedial measure, and that measure *is* taken. As noted above, a small number of courts have considered this same scenario and concluded that the reports are admissible under KRE 407, so long as references to the recommended remedial measure are redacted. These courts reason that an investigation's conclusions can be severed from the recommended, implemented remedial measure. We disagree.

On this point, we note again that the investigatory report is a "prerequisite to any remedial safety measure." *Martel*, 525 N.E.2d at 664. It is the first step in the remedial process, and without more, the process is incomplete. Once those recommended remedial steps are taken, however, the remedial process is completed, and the report is no longer a mere prerequisite. We hold that, at that point, the report is so inextricably intertwined with the

17

subsequent remedial measure that it must be excluded as such under KRE 407.

We believe that this holding aligns with the policy rationale behind KRE 407, namely, to encourage defendants to take remedial measures. *See Werner*, 628 F.2d at 857 (describing policy rationale behind FRE 407). Alleged tortfeasors should be encouraged to not only conduct self-critical analyses but to perform the recommended remedial measures because doing so can prevent the full investigatory report from being used in a subsequent civil suit to prove liability.

We also believe that this holding aligns with the limited Sixth Circuit precedent addressing this issue. For example, in *Wilson v. Beebe*, 770 F.2d 578 (6th Cir. 1985), the Court found that a post-shooting report, in which a police officer was found to have acted contrary to his training, was *not* excludable under FRE 407. *Id.* at 590. That Court briefly explained, "The report did not recommend a change in procedures following the shooting; it was a report of that incident and nothing more." *Id.*

Later, in *In re Air Crash*, the Sixth Circuit considered the applicability of FRE 407 to an internal memorandum drafted two months after an airplane crash. The memorandum explained that a flight crew check of the takeoff warning system on board that particular plane model was not necessary because the system's fail light should warn crews about any system failure. 86 F.3d at 531-32. The report also discussed the company's recommendation to buyers of another plane model to perform such a system check prior to take

18

off. *Id.* at 531. This recommendation had been made in response to an earlier plane crash. *Id.* The Sixth Circuit held that the memorandum should be excluded, explaining, "It is obvious that the memorandum is part of a discussion about whether [the airplane manufacturer] should recommend the check in the future—and such a change in policy is a subsequent remedial measure within the meaning of Fed.R.Evid. 407." *Id.* at 532 (citing *Hall v. American Steamship Co.*, 688 F.2d 1062, 1066 (6th Cir. 1982)). Thus, the Sixth Circuit has drawn a distinction between reports that recommend changes in procedure, which thereby become "part of" that discussion, and reports that make no such recommendation.

For the reasons set forth above, we disagree with that portion of the Court of Appeals' opinion holding that the mere act of formulating a plan to require additional training, such as creating an RCA report, necessarily qualifies as a subsequent remedial measure automatically subject to exclusion under KRE 407. Rather than adopt that approach, we direct our trial judges to consider this issue on a case-by-case basis. When the report provides a recommendation for improvement, which is then implemented, the entire report should be considered a subsequent remedial measure under KRE 407. However, in those cases in which a post-incident investigatory report provides a recommendation for improvement, but such recommendation is not acted upon, the report likely will not trigger exclusion under KRE 407. We again note that this should be considered on a case-by-case basis.

19

With this holding in mind, we next consider whether the trial judge in the present case abused his discretion in excluding the RCA. The RCA recommended inservice training, but that training was not performed. Stated another way, the RCA was the first step in the remedial process, but that process was not completed. Because the recommended remedial measure was not taken, it is impossible for the RCA to become so inextricably intertwined with that measure that the RCA must be excluded. Furthermore, had a mere recommendation for additional training taken place before Mrs. Thomas's surgery, that recommendation—without more—would *not* have made her death less likely to occur. In fact, the RCA notes only that "medical management of airway in postoperative patient" was a human factor "relevant to the outcome." The report states that these human factors were *not* the root cause of Mrs. Thomas's death, and it does not opine that changes to the medical management of the airway would have necessarily made Mrs. Thomas's death less likely to occur. For these reasons, we hold that, under the facts of this case, the RCA did not qualify as a subsequent remedial measure under KRE 407.

Accordingly, the trial court erred in excluding the RCA under KRE 407. We find this error to be harmless, however, as the RCA was properly excluded under KRE 403, as explained below.

## B. The Court of Appeals' KRE 403 analysis was not improper, and the Root Cause Analysis was properly excluded under KRE 403.

Under KRE 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the

20

determination of the action more probable or less probable than it would be without the evidence." Under KRE 402, "[a]ll relevant evidence is admissible" unless otherwise excluded by the law or our rules of evidence. "Evidence which is not relevant is not admissible." *Id.* However, under KRE 403, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

Thomas argues that the Court of Appeals erred by misconstruing the evidence in the record and misapplying KRE 403 to that evidence. First, Thomas points to the following excerpt from the Court of Appeals' opinion: "The question, then, is whether an entity's contemplation of a measure that it ultimately decides not to take could reasonably be inferred as an admission of fault. Logically, the answer is no. If a defendant is deemed to speak through its actions and does *nothing*, it admits *nothing*." Thomas argues that the Court of Appeals improperly assumed that UMC made an affirmative decision to forgo the proposed inservice training, when it is equally plausible that UMC simply neglected to follow through with the recommended training. However, even if the Court of Appeals improperly assumed one version of events over the other, we fail to see how this distinction impacted that court's analysis.

Next, Thomas argues that the Court of Appeals inaccurately stated that the circuit court excluded the RCA under KRE 403. According to Thomas, the trial court did *not* find that the RCA's prejudicial impact outweighed its

21

probative value. Rather, in the trial court's January 19, 2016 order granting UMC's motion in limine with respect to the RCA, the court references only KRE 407. In the trial court's June 16, 2016 order, the court *does* reference KRE 403 and considers the "minimal probative value" of the RCA and "the prejudicial impact associated with the information." However, that order addressed Thomas's motion for clarification, in which he sought to admit the RCA to establish punitive damages, not to demonstrate liability. Thus, the trial court did not directly apply KRE 403 when considering UMC's motion in limine, instead excluding the RCA under KRE 407.

Nevertheless, we may affirm the lower court for any reason available in the record. *Ky. Farm Bureau Mut. Ins. Co. v. Gray*, 814 S.W.2d 928, 930 (Ky. App. 1991) (citation omitted). We therefore turn to the KRE 403 issue at hand. On this point, Thomas argues that the Court of Appeals erred in concluding that the probative value of the RCA stemmed from UMC's failure to provide the proposed training. Thomas asserts that the probative value actually stemmed from UMC's apparent belief that such training was needed in the first place.

We do not necessarily disagree with Thomas's assertion that the RCA's probative value stemmed from its recommendation to perform additional training. However, this probative value was minimal. The RCA stated that human factors relevant to the outcome—meaning relevant to Mrs. Thomas's death—included "[m]edical management of airway in postoperative patient." The Action Plan portion of the report recommended inservice education "to recognize signs and symptoms of mechanical airway obstruction" for all

22

individuals involved in the incident. Thus, the RCA was probative of the human factors "relevant to" Mrs. Thomas's death and what actions could be taken in response to those human factors. However, the RCA clearly states that these human factors were not a root cause of Mrs. Thomas's death. In addition, the report found *no* root cause of her death. This finding diminishes the probative value of the report—the RCA does not tend to show that human error or negligence was a cause of Mrs. Thomas's death.

Against this limited probative value, we consider the prejudicial impact of the RCA, as well as the potential for confusion of the issues or misleading the jury. *See* KRE 403. In this case, a jury could easily become confused or distracted by the distinction between human factors "relevant to the outcome" and human factors that are the root cause of the outcome. In other words, the jury is likely to assign unfair weight to the RCA, thereby unduly prejudicing the defendants. Given this potential for undue prejudice, we cannot say that the trial court abused its discretion in excluding the RCA.

In sum, we believe that the Court of Appeals properly considered KRE 403 and the RCA was properly excluded under that rule.

## C. The trial court did not err in excluding the Root Cause Analysis when offered for impeachment purposes.

Though KRE 407 excludes evidence of subsequent remedial measures, it "does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." Accordingly, in this case, the trial court excluded the RCA under KRE 407 but explained that it

23

could be admitted to impeach or rebut the testimony of the defendants' witnesses. Thomas now argues that the trial court erred in excluding the RCA when offered at trial to impeach the testimony of UMC's corporate representative. We disagree.

At trial, Thomas called as a hostile witness Cynthia Lucchese, UMC's Director of Nursing Support Services and its designated corporate representative. Thomas's counsel asked Ms. Lucchese whether the nurses involved in Mrs. Thomas's care needed "additional training on airway management" as of August 15, 2008, the date of the incident. Ms. Lucchese responded, "No, sir." Counsel then approached the bench and Thomas's attorney requested to use the RCA to impeach Ms. Lucchese. He argued that UMC, via Ms. Lucchese, had denied that its nurses needed additional training on airway management while the hospital's RCA investigation concluded that they *did* need additional training.

The trial court denied the request, explaining that "it's not really impeachment" because Ms. Lucchese only stated that the hospital believed that its nurses were adequately trained. The trial court explained that the RCA's conclusion "that they should probably have additional training is not the same as saying that they did not have enough training" as of the date of the incident. The judge clarified, however, that Thomas could call an expert to provide an opinion on the adequacy of the nurses' training.

We agree with the trial court that Thomas's proposed use of the RCA did not qualify as proper impeachment under our rules. Our evidentiary rules

24

allow "[t]he credibility of a witness [to] be attacked by any party, including the party calling the witness." KRE 607. To do so, a party may question a witness on his or her bias, interest, or hostility, including the witness's relationships, personal and monetary interests in the outcome of the case, and susceptibility to corrupting influences[9]; certain prior convictions[10]; prior conduct[11]; and prior inconsistent statements.[12] We have also stated that one may present contradicting evidence to impeach a witness regarding a material fact. *Trover v. Estate of Burton*, 423 S.W.3d 165, 174 (Ky. 2014) (citation omitted). However, to do so, the proffered impeachment evidence must actually contradict the witness's statements. *Commonwealth v. Jackson*, 281 S.W.2d 891, 895–96 (Ky. App. 1955) (citing 3 Wigmore on Evidence § 1040 (3rd ed.)), *overruled on other grounds by Jett v. Commonwealth*, 436 S.W.2d 788 (Ky. 1969).

Here, Ms. Lucchese opined that the nurses involved in Mrs. Thomas's care did not need additional training on airway management as of August 15, 2008, the date of Mrs. Thomas's surgery. The drafters of the RCA, on the other hand, suggested such training for all individuals involved, but there is no statement in the RCA that the nurses *needed* such training on the day of Mrs. Thomas's surgery. In other words, the RCA concluded that the nurses might

---

[9] *See* ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.10 (5th ed. 2013).

[10] *See* KRE 609; LAWSON, *supra*, at § 4.30.

[11] *See* KRE 608; LAWSON, *supra*, at § 4.25.

[12] *See* KRE 613 (providing prerequisites for introduction of prior statements); LAWSON, *supra*, at § 4.15.

benefit from additional training, but it did not go so far as to say that the nurses' training was otherwise inadequate. Simply put, then, the RCA does not directly contradict Ms. Lucchese's opinions as stated. As such, it could not be used as contradictory evidence to impeach Ms. Lucchese. We therefore hold that the trial court did not err in excluding the RCA for the proposed impeachment of Ms. Lucchese.

## D. The trial court did not err in granting a directed verdict for the Neurological Institute of Kentucky, P.S.C.

We have previously explained that "a motion for directed verdict . . . should be granted only if 'there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable minds could differ.'" *Jewish Hosp. & St. Mary's Healthcare, Inc. v. House*, 563 S.W.3d 626, 632 (Ky. 2018) (quoting *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 506 (6th Cir. 1998)). When considering such a motion, the trial judge must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion. *Id.* at 630 (citing *Argotte v. Harrington*, 521 S.W.3d 550, 554 (Ky. 2017)). On appeal, the reviewing court must consider whether, under the evidence as a whole, it would be clearly unreasonable for a jury to find for the plaintiff. *Id.* (citing *Argotte*, 521 S.W.3d at 554).

In his original complaint, Thomas alleged that NIK, by and through the actions of its agents, including Dr. Vitaz, was negligent in the care and treatment of Mrs. Thomas. Thomas later added claims of negligent supervision and training against UMC, NIK, and Dr. Vitaz. He specifically alleged that NIK

26

and Dr. Vitaz, who is a member of the NIK practice, were negligent in the supervision, training, and monitoring of Drs. Kazmi and Jernigan, two residents at UMC.

At the close of proof, NIK moved for a directed verdict on the basis that it, as a corporate entity, was not obligated to supervise or train the hospital's neurosurgical residents. It argued that Thomas had failed to present proof that NIK had any duty to supervise the hospital's resident doctors. The trial judge found that "there's nothing in the record" to support Thomas's claims against NIK. Referring to the duty to supervise, the judge explained, "They didn't sign up for that. It's not reasonable to believe that they did. There is insufficient proof to believe that they did." The trial court therefore granted the motion for directed verdict.[13]

Thomas now argues that the record contained contradictory evidence on this issue, and the question of NIK's liability therefore should have been decided by the jury. Specifically, Thomas points to language in a Professional Services Agreement between UMC and NIK. Thomas also points to the trial testimony of Dr. Christopher Shields, a professor of neurosurgery at the medical school and a physician-member of NIK. Based on this testimony and the contract language, Thomas argues that the directed verdict was improper.

---

[13] Though the parties' arguments and the trial judge's statements from the bench focused on the negligent supervision claim, we note that no claims against NIK were presented to the jury. We therefore conclude that the trial court granted a directed verdict on all claims against NIK.

The Court of Appeals declined to consider this issue because the jury ultimately found in favor of all defendants. Thus, the Court of Appeals concluded, any error in granting the directed verdict was harmless. This was an appropriate analysis for the underlying medical negligence claim against NIK, as that claim necessarily relied on a vicarious liability theory. In other words, NIK would only have been liable if its agents were negligent, and here, the jury found no such negligence.

Claims of negligent training and supervision, on the other hand, are based on the employer's independent negligence. *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 (Ky. 2014). We therefore consider whether, under the evidence as a whole, it would be clearly unreasonable for a jury to find for Thomas on this claim. *House*, 563 S.W.3d at 630 (citing *Argotte*, 521 S.W.3d at 554).

We turn first to the contract language cited by Thomas. As an initial matter, we note that "[t]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. App. 2000) (citation omitted).

Thomas first points to the "Background Statement" of the contract. Paragraph A of that section describes the hospital and Paragraph B describes NIK and its "physician-shareholders and physician-employees who will provide services under this Agreement," referred to as the Practitioners. Thomas focuses on Paragraph C, however. That paragraph provides in full:

28

> To better serve [UMC], [University of Louisville School of Medicine] and the community, [NIK] and the Practitioners have agreed to expand their current professional practice to provide additional clinical supervision to the School's residents, additional sub-acute care to the indigent and low income population served by the Hospital and the associated ambulatory care clinic, and additional service to the Hospital, including enhanced coverage of the Service, research activities and emergency department. This document is established to define the parties' essential rights and responsibilities under that agreement.

Relying on this language, Thomas argues that NIK contracted to provide "additional clinical supervision" to UMC's resident physicians. However, such "[p]refatory statements or recitals to a contract are customarily not an essential part of the agreement." *Jacob v. Dripchak*, 331 S.W.3d 278, 283 (Ky. App. 2011). In this case, Paragraph C of the Background Section merely explains the purpose of the contract: NIK and its physicians would expand their practice and provide a variety of services to better serve the hospital, the medical school, and the community. That provision does not explain or define NIK's or the physicians' responsibilities under the contract. Rather, it explains that the document itself "is established to define the parties' essential rights and responsibilities." Simply put, Paragraph C does not create a contractual obligation.

Thomas also points to Section 1.3 of the contract, which states that NIK and its physicians "shall provide those additional services described by reference to Addendum 1.3." He argues that the services described in Section 2.2(c) in Addendum 1.3 include the supervision of resident physicians. Section 2.2 provides that NIK "will assure Practitioner coverage on the Hospital campus

29

as follows," then proceeds to discuss the minimum average hours per week that the physicians will provide. Section 2.2(c) then provides, in full:

> In all scenarios, [NIK] will generally provide coverage between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday, legal holidays excepted. For purposes of this Agreement, the Hospital's campus includes the 2 square block area bounded by Preston, Chestnut and Hancock Streets and Muhammad Ali Boulevard. While on campus, **Practitioners shall devote their full time and attention to service for Hospital and its neurosurgery patients, specifically including, but not limited to, emergency trauma patients, the supervision of residents in the surgical and ambulatory care settings in accordance with 42 CFR Chapter 415, and to the provision of the administrative services contemplated by this Agreement.** In this regard, Hospital acknowledges that Practitioners cannot perform all services at one time, and may not be able to perform any one service at a given moment due to conflicting obligations on Hospital's campus, temporary absences or other justifiable or uncontrollable circumstances. In turn, [NIK] agrees to use reasonable efforts to balance the schedules of the Practitioners in an effort to achieve the goals and perform the services required by this Agreement in a manner that is efficient and quality-centered.

(Emphasis added.) Thomas argues that this language explicitly states that NIK "will assure" that its physicians "devote their full time and attention to," among other things, "the supervision of residents." From this, Thomas suggests that NIK has a contractual obligation to supervise UMC's neurosurgical residents.

We find this to be a strained and impractical reading of this provision. Rather, this provision provides that NIK "will assure *Practitioner coverage*" during the listed times and will "use reasonable efforts to balance the schedules of the Practitioners in an effort to achieve the goals and perform the services required by this Agreement in a manner that is efficient and quality-centered." The Practitioners—not NIK—will then "devote their full time and attention" to providing services to UMC, including, among other things, "the

30

supervision of residents in the surgical and ambulatory care settings in accordance with 42 CFR Chapter 415." Thus, NIK contracted to provide the physicians to UMC, and the physicians contracted to provide certain services to the hospital. This is further evidenced by the fact that Dr. Shields signed the contract on behalf of NIK, as its president, while the other individual physicians signed the contract on their own behalf. They signed Addendum 1.1, titled "Agreement of Practitioners," in which they agreed "to perform all obligations . . . required of the Practitioners under the Agreement."

Having concluded that the contract does *not* impose upon NIK a duty to supervise UMC's neurosurgical residents, we turn to the testimony of Dr. Shields. During direct examination, Dr. Shields testified that NIK did not supervise or train residents. During cross-examination, however, counsel for Thomas presented Dr. Shields with a copy of the Professional Services Agreement. He was asked to review Paragraph C of the Background Section and, in reference to that provision, was asked if it said that NIK "and the practitioners have agreed to clinical supervision of the school's residents." Dr. Shields stated that "that's part of the sentence," but he insisted on reading the remainder of Paragraph C. He then stated, "So this contract was for several services that were very significant as part of the arrangement that existed between [UMC] and [NIK]."

Thomas's counsel then asked if supervision of residents was one of the duties of NIK listed in Paragraph C. At this point, opposing counsel objected, arguing that Dr. Shields could not provide a legal conclusion and could not

31

interpret the contract. The trial judge agreed but allowed Thomas's counsel to ask Dr. Shields what the contract said.

Thomas's counsel then asked Dr. Shields, "In Paragraph C, does this contract provide that [NIK] and its practitioners agree to provide clinical supervision of the residents?" Dr. Shields replied:

> As part of many responsibilities. Let me give you the background of what created this. [UMC] wanted to have a greater presence of neurosurgeons at [UMC]. They wanted to see us in the hallways. They wanted us to be available to answer the emergency calls, to take care of activities going on in the hospital. That was the primary reason for them coming to us to say, look, what do we have to do to have you—any one of the faculty members—spend more time at University Hospital? It was not really primarily—it was never generated primarily for the role of teaching residents. It was for these other things. Now, you're right, if one parses and takes one point out of it, that is included in the contract, but it was not the primary motivating force to have this contract created.

Thomas's counsel did not inquire further about Paragraph C.

Later in the cross-examination, Thomas's counsel directs Dr. Shields to Addendum 1.3 and asks whether Section 2.2(c) "list things that [NIK] will do under the contract." Dr. Shields replied, "Yes, several things," and ultimately referred to the "supervision of residents" language in Section 2.2(c). He explained that

> when [the physicians] went there, we were not acting as representatives of [NIK], we were acting in our role as faculty of University of Louisville. That was—that's why each one of us signed that, it was not signed solely as a corporate document, it was signed with each one of us going over, and once we stepped over into [UMC], we had these other roles, but we were wearing our hat as a faculty member of the University of Louisville.

Thomas's counsel then asked, "Among the roles that [NIK] had, one of them was supervising the residents, is that true?" Dr. Shields replied, "It was one of

32

the roles, but I have to clarify that when we were in [UMC] we were not acting nor did we ever act as an agent of [NIK]; we were acting in the role of a faculty member in the University of Louisville, wearing that academic hat whenever we stepped foot in [UMC]."

Thomas now argues that Dr. Shields admitted that the contract created a duty to supervise. We note again, however, that the interpretation of a contract is a question of law to be decided by the court, not by a lay witness. Thus, Dr. Shields was not qualified to interpret the contract, and, pursuant to the trial court's instructions, Thomas's counsel could only ask Dr. Shields what the contract *said*. To the extent that Dr. Shields attempted to interpret the contract, the jury would not have been bound by that legal conclusion. Furthermore, for the reasons stated above, the plain language of the contract does not support an interpretation that NIK is obligated to supervise UMC's neurosurgical residents.

For these reasons, we conclude that Thomas failed to present sufficient evidence that the contract at issue obligated NIK to supervise and train UMC's resident physicians, and accordingly, it would have been unreasonable for a jury to find in Thomas's favor on the negligent supervision and training claim against NIK. We therefore hold that the trial court did not err in granting a directed verdict in favor of NIK on that claim.

For these reasons, we hold that the trial court did not err in granting NIK's motion for directed verdict on the negligent supervision and training

claim and that, even if the trial court erred in doing so on the vicarious liability claim, any such error was harmless.

## III. CONCLUSION

For the reasons set forth above, we hereby affirm the decision of the Court of Appeals.

Minton, C.J; Hughes, VanMeter, Wright, JJ., Foster and Bentley, S.J., sitting. All concur. Lambert and Nickell, JJ., not sitting.

COUNSEL FOR APPELLANT:

Thomas Wesley Faulkner
Faulkner Law Offices

COUNSEL FOR APPELLEE, UNIVERSITY MEDICAL CENTER, INC. D/B/A UNIVERSITY OF LOUISVILLE HOSPITAL:

Beth Hendrickson McMasters
Sara Clark Davis
McMasters Keith Butler, Inc.

COUNSEL FOR APPELLEES, NEUROSURGICAL INSTITUTE OF KENTUCKY, PSC; TODD W. VITAZ, M.D.; SARAH C. JERNIGAN, M.D.; AND AASIM KAZMI, M.D.:

John Witt Phillips
Patricia Colleen Le Meur
Katherine Tipton Watts
Phillips Parker Orberson & Arnett, PLC